# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

SUSAN M. RYAN,

    Plaintiff,

vs.

KILOLO KIJAKAZI, Acting Commissioner of Social Security,

    Defendant.

No. C20-4014-LTS

**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION**

## I. INTRODUCTION

This case is before me on a Report & Recommendation (R&R) by the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge. Doc. 25. Judge Mahoney recommends I affirm the decision of the Commissioner of Social Security (the Commissioner) denying plaintiff Susan Ryan's applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.

## II. APPLICABLE STANDARDS

### A. *Judicial Review of the Commissioner's Decision*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642,

645 (8th Cir. 2003). The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

To determine whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ [Administrative Law Judge], but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence detracting from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court "must search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

The court must apply a balancing test to assess any contradictory evidence when it analyzes an appeal where the ALJ has denied benefits. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court "find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even if the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730

2

F.2d 1147, 1150 (8th Cir. 1984); *see also Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

### B.     *Review of Report and Recommendation*

A district judge reviews a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude

3

further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III. THE R&R

Ryan applied for DI benefits on October 17, 2016, alleging her disability began on June 4, 2011.[1] AR 11. She then applied for SSI benefits on April 6, 2017. *Id.* Both applications were denied initially and on reconsideration. *Id.* After Ryan requested a hearing, an ALJ held an administrative hearing on November 8, 2018. *Id.* Ryan, her daughter and a vocational expert (VE) testified. *Id.*

The ALJ issued his decision on February 20, 2019, finding Ryan was not disabled. AR 11-22. The ALJ found Ryan suffers severe impairments from chronic pain syndrome, anxiety disorder and depressive disorder. *Id.* at 14. However, the ALJ found she did not have an impairment or combination of impairments equaling the severity of a listed impairment. *Id.* at 16. The ALJ determined Ryan had a residual functional capacity (RFC) to perform light work as defined in 20 C.F.R § 404.1577(b) and § 416.967(b), with the following restrictions:

> [S]he cannot climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs, stoop, kneel, crouch, crawl; she can frequently balance; she should not work around hazards, like unprotected heights and moving mechanical parts; she is able to perform simple and routine tasks; and she is able to have occasional contact with coworkers and the public.

*Id.* at 18. Further, the ALJ found Ryan could not perform her past relevant work but "there are jobs that exist in significant numbers in the national economy that [Ryan] can perform." *Id.* at 22. The ALJ noted, and the VE testified, Ryan could work as a cleaner/housekeeper, laundry worker, and machine tender. AR 22. Therefore, the ALJ

---

[1] Ryan alleged that she suffers from a variety of physical and mental impairments, including chronic pain, migraines, eye disease and depression. Doc. 17 at 1.

4

concluded, Ryan was not disabled. AR 23.

Ryan appealed and the Appeals Council denied her request for review, rendering the ALJ's decision final. AR 1-3. On March 13, 2020, Ryan filed a timely complaint (Doc. 3) seeking judicial review of the Commissioner's decision. After the case was fully briefed, Judge Mahoney filed her R&R (Doc. 25) on August 13, 2021.

Judge Mahoney noted that Ryan's briefing was "muddled" but distilled her arguments into three categories: (1) the ALJ failed to recognize her vision issues and migraines as severe impairments, (2) the ALJ failed to consider her subjective complaints when determining her RFC and (3) the ALJ failed to appropriately regard the VE testimony, which she states supported a finding of disability. Judge Mahoney first addressed whether the ALJ had obtained sufficient evidence to make a finding that Ryan's vision impairment did not significantly limit her ability to work, therefore constituting a non-severe impairment. Doc. 25 at 6. Judge Mahoney noted Ryan did not mention a vision impairment in her disability application or in her February 2017 function report, instead claiming she had no vision issues. *See* Doc. 25 at 6 (citing AR 84, 334-41).

However, Ryan wrote in a September 2017 function report that she had an upcoming appointment with a specialist to discuss a freckle on the optic nerve of her left eye (medically referred to as a choroidal nevus). Doc. 25 at 6. Judge Mahoney also recognized that Ryan testified she could not "read anything up close" and suffered from light sensitivity, floaters, and visual auras because of her migraines. Doc. 25 at 6 (citing AR 61, 65). Judge Mahoney then pointed out that Ryan incorrectly argued that the ALJ did not properly consider treatment notes from the University of Iowa Hospital, as the ALJ specifically mentioned two of the three treatment notes while determining that her vision impairment was non-severe. Doc. 25 at 6-7 (citing Doc. 20 at 4).

Judge Mahoney further identified other facts in the record supporting the ALJ's conclusion that Ryan's vision impairment was not severe. Doc. 25 at 6–7. For example, while doctors discovered Ryan's choroidal nevus in September 2015, she was not referred to a specialist until July 2017. *Id.* At that appointment, the specialist observed "minimal

5

enlargement," and Ryan chose to forgo radiation treatment because it could have led to vision loss. *Id.* Both Judge Mahoney and the ALJ noted her choroidal nevus was described as "stable" at later appointments. *Id.* Finally, Judge Mahoney noted that while Ryan did on occasion endorse symptoms such as light sensitivity, light flashes, and floaters in both eyes, hospital records do not show Ryan regularly complained of vision changes and instead consistently denied vision limitations. Doc. 25 (citing 50 places in the record in which Ryan denied vision limitations). Judge Mahoney concluded substantial evidence supported the ALJ's conclusion that Ryan's choroidal nevus was a non-severe impairment, as it minimally limited her ability to work. *Id.*

Next, Judge Mahoney assessed whether substantial evidence supported the ALJ finding that Ryan's migraines constituted a non-severe impairment. *Id.* At a November 2018 disability hearing, Ryan testified her "biggest issue" was her "unstoppable migraines." AR 44-45. Ryan stated that her migraines had been "steady" since 2006, though they worsened after a motorcycle accident in June 2011. Doc. 25 at 7-8. Ryan testified she has headaches every day, often resulting in migraines lasting anywhere from four hours to four days. Doc. 25 at 8 (citing AR 46). She further claimed these migraines affected her work performance and caused her to miss work. Doc. 25 at 8 (citing AR 47-48; AR 41-43).

Judge Mahoney first noted that the ALJ did not fully credit Ryan's testimony. AR 14-15. Instead, the ALJ pointed to treatment records reflecting that Botox injections provided Ryan migraine relief. Doc 25 at 8. Further, the ALJ observed that records do not show Ryan missed any appointments because of her migraines and her medical providers generally stated she appeared to be in "no acute distress." *Id.* Also, the ALJ remarked that after Ryan's primary care provider referred her to a neurologist, the neurologist wrote Ryan "likely had no limitations related to migraines." Doc. 25 at 8 (citing AR 15).

Ryan argued that the ALJ failed to properly consider Ryan's longstanding pain clinic treatments. Judge Mahoney examined those records, noting the following:

6

Pain clinic records show that from February 2012 to April 2015, Ryan sought treatment for back, leg, and arm pain, but not headaches, even though they were listed in a review of symptoms. Doc. 25 at 9 (citing AR 625-84). During those three years, Ryan listed headaches as the chief complaint only once. *Id.* (citing AR 669). In June 2015, Ryan reported suffering from more than 15 migraines during the previous month, and the next month she reported her migraines increased after she stopped taking a prescribed opioid medication. Doc. 25 at 9 (citing AR 685; 538-39). A few weeks later, Ryan reported worsening migraines taking place four times a week though two of her medications, sumatriptan and ondansetron, helped her nausea. Doc. 25 at 9 (citing AR 535).

Ryan later visited a different pain clinic and reported that she suffered from migraine headaches, accompanied by visual impairments, which had been occurring for years. Doc. 25 at 9 (citing AR 689). She again complained of migraines at a September 2015 appointment but indicated sumatriptan helped ease some of her symptoms. *Id.* (citing AR 532). At an October 2015 appointment, Ryan reported suffering from a nine-day migraine and rated it a 10/10 on the pain scale, though the provider noted Ryan appeared to be in "no apparent distress." *Id.* (citing AR 710). Ryan underwent radiofrequency injections, which provided "excellent pain relief." *Id.* (citing AR 716).

From November 2015 to April 2016, Ryan did not include migraines in the "chief complaint section" of pain clinic records. Doc. 25 at 9 (citing AR 719-38). In July 2016, Ryan visited the emergency room twice, complaining of migraine headaches, and during one of the visits she appeared to be in "moderate distress." Doc. 25 at 10 (citing AR 614). At the time, she indicated she was not taking prophylactic migraine medicine because of its side effects. *Id.* (citing AR 609). In a follow-up appointment, she noted her headache was less severe, but "the course had been unchanged." Doc. 25 at 10 (citing AR 515-17). At an August 2016 pain clinic appointment, Ryan reported she suffered from headaches every day, and the headaches were accompanied often by nausea and visual aura. Doc. 25 at 10 (citing AR 742). At the time, sumatriptan sometimes

7

provided relief. *Id.*

The next pain clinic treatment note is from roughly six months later, in February 2017, when Ryan began Botox injections to treat her headaches. Doc. 25 at 10 (citing AR 824). From February 2017 to August 2018, Ryan primarily complained of neck and back pain, but not migraines. For example, Judge Mahoney noted the "reason for visit" and "chief complaint" section of the pain management clinic records lists migraines and headaches less than half the time, with Ryan evaluating her migraines and headaches on the pain scale even less often. Doc. 25 at 20 (citing AR 824-90, 981-1009). Records instead suggest Ryan's headaches were "much better" following her Botox injections and both her headaches and neck pain were "stable." Doc. 25 at 10 (citing AR 1045, 2018).

Further, Judge Mahoney noted the Botox injections provided significant relief, with Ryan reporting 85 percent relief for roughly two weeks after her first Botox injections (Doc. 25 at 10, citing AR 832) and 88 percent relief for three and a half weeks after her second set of Botox injections. Doc. 25 at 10 (citing AR 881). In August 2018, after more than a year of Botox injections, Ryan reported 50 percent relief from her migraines. Doc. 25 at 11 (citing AR 1074). The next month, Ryan stated the Botox was not helping quite as much, so doctors added a new medication to her treatment regime. Doc. 25 at 11 (citing AR 1080). By October 2018, Ryan had roughly 80 percent relief for nine weeks with no ER visits, nausea, or vomiting, so long as she did not strain herself. Doc. 25 at 11 (citing AR 1085). She noted the headaches were "minimal" and the Botox "changed her life." *Id.* (citing AR 1088).

Judge Mahoney also pointed out that despite improvements in Ryan's condition, she did occasionally seek treatment for her migraines after she began Botox treatments. Doc. 25 at 11 (citing 11 instances in the record in which Ryan sought migraine treatment). However, Judge Mahoney found substantial evidence supported the ALJ's decision that Ryan's migraines were not a severe impairment. *Id.* Further, Judge Mahoney highlighted that Ryan did not include migraines in her October 2016 disability application or in multiple function and disability reports completed in 2017 and 2018. *Id.* Judge

8

Mahoney agreed with the ALJ, finding that while Ryan may have suffered from headaches — even daily — they did not appear to impact her ability to engage in substantial gainful activity or attend her medical appointments. *Id.* Therefore, Judge Mahoney agreed with the ALJ's finding that migraines were not a severe impairment. Doc. 25 at 12.

Next, Judge Mahoney addressed Ryan's argument that the ALJ did not appropriately weigh her testimony. Doc. 25 at 13. Ryan seemed to argue the ALJ should have found limitations simply because Ryan testified that she required them. Doc. 25 at 14. Judge Mahoney again found the ALJ's conclusion that Ryan's vision impairment and migraines were supported by substantial evidence. *Id*. Judge Mahoney also found substantial evidence supported the ALJ's decision not to fully credit Ryan's testimony about her mobility. *Id*. Judge Mahoney pointed to several items in the record contradicting Ryan's February and September 2017 function reports, in which she claimed to use a walker and a cane. Doc. 25 at 13 (citing AR 19, 340, 389). As Judge Mahoney and the ALJ noted, treatment records showed Ryan consistently denied needing an assistive walking device and multiple healthcare providers observed she had a normal gait without use of an assistive device. Doc. 25 at 13 (citing more than 50 places in the record indicating Ryan required no mobility assistance). Therefore, Judge Mahoney found the ALJ gave good reasons supported by substantial evidence to discredit Ryan's subjective complaints. Doc. 25 at 14.

Next, Judge Mahoney discussed Ryan's claim that the ALJ "ignored" testimony by the VE that supported a finding of disability. Doc. 25 at 14. Judge Mahoney agreed that the VE's testimony would support a finding of disability if Ryan was as disabled as she alleged, but the ALJ properly rejected limitations he found were unsubstantiated by the record. *Id.* Instead, the ALJ relied on the VE's testimony that jobs existed for a person with Ryan's age, education, past work experience and the RFC the ALJ ultimately found Ryan to have. *Id.* Therefore, Judge Mahoney rejected Ryan's claim the ALJ improperly ignored VE testimony. Doc. 25 at 14.

Finally, Judge Mahoney found the ALJ's appointment did not violate the Appointments Clause of the United States Constitution because, setting aside any waiver issues, the ALJ held Ryan's hearing and issued his decision after the Acting Commissioner of the Social Security Administration had ratified and approved all ALJ appointments as her own. Doc. 25 at 14.

For these reasons, Judge Mahoney found that while the ALJ could have ruled differently, substantial evidence supported his findings. Judge Mahoney thus recommends that I affirm the ALJ's decision and enter judgment in favor of the Commissioner. *Id*. at 15.

## IV. DISCUSSION

In her objections, Ryan claims the ALJ:

1. Erred by giving little weight to Ryan's treating medical providers and no weight to the testimony of her witness and daughter, Nicole Ryan;
2. Failed to recognize all of Ryan's severe impairments;
3. Failed to consider all of Ryan's impairments, including the ones not deemed to be severe, in making his RFC determination;
4. Failed to present the VE with the correct RFC limitations; and
5. Failed to adopt the vocational expert's testimony that Ryan could not perform and/or work at any level.

Doc. 28 at 3. Because the third and fourth objections both relate to the ALJ's findings as to Ryan's RFC, I will address them together.

### A. *Weight Given to Conflicting Testimony*

Ryan first argues the ALJ inappropriately weighed opinions provided by "randomly selected medical reviewers, who never personally treated Ms. Ryan and who saw her in person for less than one (1) hour," while discounting conclusions by medical providers who regularly treated Ryan, such as Michael Espiritu, M.D. Doc. 28 at 4.

10

Ryan does not identify the specific opinions that she believes were given too much credit, but maintains these opinions should not have given greater weight than the "many, many [unnamed] medical providers who treated Ms. Ryan on a continuous basis for numerous years." Doc. 28 at 4.

"[A]n ALJ must give a treating physician's opinion controlling weight if it is well-supported by medical evidence and not inconsistent with the substantial evidence in the record." *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2)). When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must give "good reasons" for the weight assigned and consider the following factors: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability; consistency; specialization and other factors. *See* 20 C.F.R. §§ 404.1527, 416.927.

The ALJ gave the greatest weight to opinions by state medical and psychological consultations who reviewed Ryan's claims and accompanying medical files, although they did not personally examine Ryan. Doc. 14-2 at 21. The ALJ noted these consultants are acceptable medical sources familiar with how the Social Security Administration assesses disabilities. *Id*. The state agency consultants found Ryan could perform a reduced range of medium work and she was not as disabled as alleged. *Id*. However, while the consultants found Ryan to be more disabled than the ALJ ultimately concluded, he gave the consultants' opinions weight "to the extent that it supports a finding she is not a [sic] limited as alleged." Doc. 14-2 at 21.

The ALJ also gave "significant weight" to the opinions by the consultative examiners, Douglas Martin, M.D., and Michael Baker, Ph.D. *Id*. Both examined Ryan before rendering their opinions and neither found that Ryan had significant limitations. *Id*. The ALJ gave "little weight" to Dr. Espiritu's statements of how long Ryan could work per day, as the ALJ found the statements were "clearly intended" to be temporary restrictions and did not provide substantial insight on Ryan's overall functionality. *Id*.

Ryan argues the ALJ should have given more weight to opinions by her treating physicians, although Dr. Espiritu is the only provider she names and she does not cite which opinions specifically deserved more weight.[2] *See* Doc. 28. Ryan saw Dr. Espiritu for treatment on December 12, 2012, shortly after she was injured in a car accident. AR 466. At the time, Dr. Espiritu recommended therapy and various medication but did not suggest any long-term adjustments to her lifestyle. AR 427.

In February 2013, Dr. Espiritu performed surgery on Ryan's knee after her pain remained constant. AR 428. Regarding postoperative course, Dr. Espiritu recommended weight bearing only as tolerable for 1 to 3 days with crutches. *Id.* Further, he recommended a follow-up appointment in 10 to 14 days and for Ryan to begin physical therapy. AR 430. At an April follow-up appointment, Dr. Espiritu suggested that if Ryan's recovery continued, he could potentially clear her for a full day of work but would limit her to four hours per day at first. AR 432. In May 2013, he noted Ryan was doing much better, although she was not diligent about her home exercise programs. AR 435. He suggested she avoid lifting to prevent increasing knee pain but did not address her ability to work. *Id*. The next month, Dr. Espiritu concluded Ryan could begin working six hours per day for two weeks, after which she would be able to work full days without restrictions. AR 436. Ryan does not cite — nor have I located — any other opinions by Dr. Espiritu in the record. It is not clear how Dr. Espiritu's opinion, if given greater weight, would alter the ALJ's decision, as Dr. Espiritu did not suggest Ryan would be unable to find sustainable employment because of her medical condition.

Further, even if the ALJ gave Dr. Espiritu's opinion less than controlling weight, he did so for good reasons. Dr. Espiritu's opinions were narrowly tied to Ryan's recovery from the car accident and he ultimately concluded she would be able to return to work full time. The ALJ properly analyzed the length and extent of treatment, which

---

[2] Ryan was treated by many medical professionals but specifically names only Dr. Espiritu as a treating physician whose opinion the ALJ did not adequately consider.

spanned only a few months of Ryan's lengthy medical history. For all of these reasons, I find that the ALJ appropriately weighed the medical opinions in the record.

Ryan also claims the ALJ should have given weight to the testimony from her daughter, Nicole Ryan, who lived with Ryan and witnessed her day-to-day struggles. Doc. 28 at 3. Nicole testified that Ryan struggled with daily activities, such as cooking and cleaning. AR 72. The ALJ did not credit this testimony, noting that Nicole is not a "disinterested third party witness whose statements would not tend to be tainted by affection for the claiming," and finding that Nicole's statements were not consistent with the preponderance of medical opinions and observations. AR 20.

Nicole is a non-medical source of opinion. *See, e.g.,* 20 C.F.R. § 404.1513(d)(4). When considering non-medical lay opinions, a court may consider the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence. SSR 06–03p, 2006 WL 2329939, at *16 (Aug. 9, 2006). "[A]n ALJ properly may give less than controlling weight to lay-witness statements that are inconsistent with the record." *Schwandt v. Berryhill*, 926 F.3d 1004, 1010 (8th Cir. 2019).

Here, the ALJ did not err in his evaluation of Nicole's testimony. The ALJ was entitled to find that Nicole's testimony was not consistent with the medical record, which indicated that Ryan admitted to independently caring for herself. AR 18. As the ALJ noted, Ryan admitted to bathing, dressing and attending to her personal hygiene independently, as well as cooking, shopping, driving, cleaning, and managing her own money. AR 18. Given the other evidence in the record, it was not improper for the ALJ to give less than controlling weight to Nicole's testimony.

Because I find no error in the ALJ's weighing of conflicting testimony, this objection is overruled.

## B. Failure to Recognize all Severe Impairments

Ryan next argues the ALJ failed to recognize her eye impairment and migraines as severe impairments. Doc. 28 at 4. At step two of the disability analysis, the ALJ determines whether the claimant suffers from severe physical or mental impairments. A claimant's severe impairments "must have lasted or must be expected to last for a continuous period of at least 12 months"— which is called "the duration requirement." 20 C.F.R. § 404.1509.

To determine whether a claimant suffers from severe impairments, the ALJ determines whether the claimant suffers from "medically determinable physical or mental impairment[s]," which "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. The ALJ next determines whether the impairments are severe. *Id*. An impairment is severe if it "significantly limit[s a claimant's] physical or mental ability to do basic work activities," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1522. In other words, "[i]f the impairment would have no more than a minimal effect on the claimant's ability to work, then" it is not a severe impairment. *Kirby*, 500 F.3d at 707. The Eighth Circuit has stated: "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to" meet her burden of establishing that her impairments are severe. *Id*. at 708.

With regard to choroidal nevus in Ryan's left eye, the ALJ found the record did not show that more than a minimal number of work-related activities would be affected by this impairment, and therefore, it was not severe. AR 15. Judge Mahoney found substantial evidence in the record supported the ALJ's conclusion. Doc. 25 at 6-7. She noted, for example, that doctors described Ryan's choroidal nevus as stable and hospital records rarely reflected that Ryan complained of vision limitations. See Doc. 25 at 7.

Based on my de novo review, I find substantial evidence supported ALJ's decision to exclude Ryan's visual limitations as a severe impairment. Ryan has not demonstrated

14

how her vision limitations affect her ability to work, nor has she cited any medical documentation suggesting her vision impairments have any more than a minimal, if any, effect on her ability to work. Ryan's vision issues are mentioned only sporadically throughout her medical records and she has repeatedly denied vision limitations throughout her care. Therefore, I find substantial evidence supports the ALJ's conclusion that Ryan's visual impairments are not severe.

As for migraines, the ALJ found that they were not severe impairments because (1) Ryan reports "good relief" from her migraines following Botox injections, (2) despite Ryan's claims as to the frequency of her migraines, doctors regularly reported that she did not appear to be in pain during her appointments, and (3) the neurologist at her May 2018 consultation noted she likely had no limitations related to migraines. AR 15. Ryan disagrees and argues Judge Mahoney erred in her review of the ALJ's findings by focusing on whether specific medical records included migraines as a chief complaint and not recognizing that the records reflected only the concerns the provider was addressing at that very moment. Doc. 28 at 5. Ryan argues that she could strive only to communicate her most pressing concern at each medical appointment. *Id*. at 4.

While the record might have supported a different conclusion, I find substantial evidence supports the ALJ's finding that Ryan's migraines did not constitute a severe impairment. It is not appropriate to reverse the ALJ's decision simply because some evidence would support a different conclusion. *Perks*, 687, F.3d at 1091. A neurologist stated Ryan likely had no limitations related to migraines, writing in a letter that "[f]rom my standpoint, I do not see any real impairment and she could certainly pursue a usual and customary activity without limitation or restriction based upon my examination." AR 904. From February 2012 to April 2015, Ryan sought pain treatment but did not include headaches as a reason for treatment. Doc. 25 at 9 (citing AR 625-84). Pain clinic records from November 2015 to April 2016 show Ryan failed to include migraines in the "chief complaint" section. Doc. 25 at 9 (citing AR 719-38). After she began Botox injections, Ryan primarily complained of neck and back pain.

15

Ryan argues that migraines are her chief complaint but, as Judge Mahoney pointed out, she listed them only about half of the time in the "reason for visit" and "chief complaint" section of pain clinic records. Doc 25 at 20 (citing AR 824-90, 981-1009). In addition, Ryan acknowledged that her headaches became minimal and that Botox "changed her life." AR 1088. Based on my de novo review, I find substantial evidence supported the ALJ's finding that Ryan's migraines were not a severe impairment. This objection is overruled.

### C. *Adequately Addressing All Impairments in the RFC*

Ryan next challenges the ALJ's finding that she can perform light work, with the following moderate exceptions:

> she cannot climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs, stoop, kneel, crouch, crawl; she can frequently balance; she should not work around hazards, like unprotected heights and moving mechanical parts; she is able to perform simple and routine tasks; and she is able to have occasional contact with coworkers and the public.

AR 17. Ryan argues that "[a]ctual full consideration of the [medical records and testimony], required . . . ALJ to find that Ms. Ryan did not have the residual functional capacity to perform work at any level." Doc. 28 at 6.

A claimant's RFC is "what [the claimant] can still do" despite his or her physical or mental limitations. 20 C.F.R. § 404.1545(a)(1). To determine a claimant's RFC, the ALJ must consider all of a claimant's impairments, both severe and non-severe. *Id.* § 404.1545(a)(2). In doing so, the ALJ must evaluate "all of the relevant medical and other evidence" in the record. *See* 20 C.F.R. § 404.1545(a)(3); *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley*

*v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). When presenting an RFC assessment, an ALJ "generally should explain the weight given to opinions … or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning." 20 C.F.R. § 404.1527(f)(2); *see also* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion.… [and] … why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

Here, in assessing Ryan's RFC the ALJ relied on all reported symptoms and the extent these symptoms were consistent with objective evidence. AR 17. He gave significant weight to medical testimony from the state agency medical and psychological consultants, as they are acceptable medical sources familiar with Social Security Administration standards. AR 20. Further, these opinions were consistent with objective evidence in the records, which the ALJ found demonstrated only mild abnormalities and overall retained functioning. *Id.* For these reasons, the ALJ also gave significant weight to the consultative examiners, who also examined Ryan prior to rendering their opinions. *Id.* Finally, the ALJ explained why he gave less weight to statements by Ryan, her daughter, and Dr. Espiritu. Ryan's subjective complaints contradicted the objective evidence in the record, as did her daughter's testimony, and Dr. Espiritu's statements were limited to a temporary period of time when Ryan was recovering from a car accident. AR 19-20.

Based on my de novo review, I find that the ALJ's determination of Ryan's RFC is supported by substantial evidence. As such, Ryan's objections based on the RFC assessment are overruled.[3]

---

[3] My finding that substantial evidence supports the ALJ's RFC determination resolves Ryan's objection that the ALJ did not correctly describe Ryan's RFC when posing questions to the VE.

### D. Failing to Regard and Adopt Relevant VE Testimony

Ryan argues the ALJ erred by (1) discounting VE testimony that the Dictionary of Occupational Titles (DOT) does not address Ryan's necessary absenteeism and time off-task and (2) failing to adopt the VE's finding that Ryan could not perform or work at any level. *See* Doc. 28 at 3. She contends the VE confirmed her need for time off-task and that her required absenteeism would make it difficult for her to maintain a job. Doc. 28 at 9. She further asserts that it is "illogical to believe that a 50 year old [sic] with Ms. Ryan's need to regularly be out on sick leave and/or away from the tasks of the job is likely to find and/or retain employment." *Id*.

The claimant bears the burden to prove his or her RFC. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004). Thus, if Ryan claims her medical conditions prevent her from working, she has the burden to make that showing. *See Brock v. Astrue*, No. 4:07-CV-00632-NKL, 2008 WL 4104551, at *16 (W.D. Mo. Aug. 28, 2008) ("the fact that a claimant must attend regular healthcare appointments does not necessarily indicate that she cannot work; there is nothing in the record to indicate that Brock could not schedule appointments around her work schedule.").

Here, the VE testified that a typical employer will not tolerate an employee being absent two or more days per month, or being off-task more than 10 percent of the time. AR 78-79. With regard to the need for breaks, the VE explained:

> Typically an individual will go to work and work one and a half to two hours. They will have a 15-minute break. They will return to work one and a half to two hours. They will have at least a 30-minute break for a meal period. They will return to work one and a half to two hours, have a 15-minute break, return to work one and a half to two hours, which completes the day. In addition to those, it is typically acceptable to have up to two breaks, usually one prior to the meal period, one after the meal period, of certainly less than five minutes, just long enough to take a quick bathroom break, get a drink of water. Any more than that and if it occurred on an ongoing bases, the employee would typically not be maintained for the job.

*Id*. at 79-80. According to the VE, an employee who is unable to work three days a week due to headaches would not be maintained on the job. *Id*. 78-79.

The VE testified that there were no inconsistencies between the DOT and her testimony concerning absenteeism and off-task time, as the DOT does not address those issues. Id. at 77. Instead, the VE's answers were based on over 25 years of experience in doing on-site job analyses and research. Id. 77-78.

While Ryan correctly summarizes the VE testimony about these issues, she has failed to show that this testimony applies to her situation. I have already concluded that the ALJ's findings as to Ryan's RFC are supported by substantial evidence in the record. The ALJ did not adopt the limitations that Ryan relies on to contend that the VE's testimony requires a finding of disability. Thus, and as Judge Mahoney pointed out, the VE's testimony would support a finding of disability if Ryan was as disabled as she alleged. Doc. 25 at 14. Because Ryan's RFC, as ultimately and properly determined by the ALJ, does not include such severe limitations, the VE's testimony about a hypothetical individual with those limitations is simply irrelevant.

By contrast, the VE testified that jobs existed for a hypothetical person with Ryan's age, education, past work experience and RFC. AR 75-76. The ALJ was entitled to rely on this testimony to conclude that Ryan is not disabled. This objection is overruled.

### V. CONCLUSION

For the reasons set forth herein:

1. Ryan's objections (Doc. 28) are overruled and I **accept** the Report and Recommendation (Doc. 25) **without modification**. *See* 28 U.S.C. § 636(b)(1).

2. Pursuant to Judge Mahoney's recommendation, the Commissioner's disability determination is hereby **affirmed**.

3. Judgment **shall enter** against the plaintiff and in favor of the Commissioner.

**IT IS SO ORDERED.**

**DATED** this 21st day of October 2021.

_____
Leonard T. Strand, Chief Judge